AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

ARBI SETAGHAIAN SANGBARANI,

Defendant

Case No. 2:22-mj-02576-DUTY

LODGED
CLERK, U.S. DISTRICT COURT
7/1/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: CD  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
7/1/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: DL  DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown and continuing until at least February 11, 2020, in Los Angeles County, within the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii) | Conspiracy to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Christopher Siliciano, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 7/1/2022 at 3:12 P.M.

Rozella A. Oliver
Judge's signature

City and state: Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
Printed name and title

AUSA: Keith D. Ellison (6920)

**AFFIDAVIT**

I, Christopher Siliciano, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against ARBI SETAGHAIAN SANGBARANI for a violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A)(viii), Conspiracy to Distribute Methamphetamine (50 Grams or More).

2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF AFFIANT

3. I am a Special Agent with the FBI and have been so employed since October 2017. As a requirement for employment, I successfully completed the New Agent Basic Field Training Course located at the FBI Training Academy in Quantico, Virginia. I have received both formal and informal training from the FBI and other institutions regarding computer technology, financial

investigations, cryptocurrency, and drug trafficking organizations.

4. As a special agent with the FBI, I am a Federal Law Enforcement Officer, authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States. I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, computer-based financial crimes, money laundering, firearms, fraud, and other organized criminal activity. I have prepared, executed, and assisted in numerous search and arrest warrants. I have also conducted and participated in criminal and administrative interviews of witnesses and suspects. I am familiar with the formal methods of drug trafficking investigations, including, but not limited to, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, the use of undercover agents, and analysis of financial records. I have participated in investigations of organizations involved in the laundering of cryptocurrency or cash in order to conceal the illicit source of the funds.

### III. STATEMENT OF PROBABLE CAUSE

**A. Background of Investigation**

5. Agents began investigating a darknet drug vendor using the vendor accounts "Nolove2323," "HectorsMom," and "Stealthgod" in February 2019. In the course of the investigation, agents seized USPS parcels containing methamphetamine and MDMA that had

been dropped off at various post offices to satisfy orders placed on the darknet, including some orders from undercover agents.  U.S. Customs and Border Protection Officers also interdicted incoming international parcels containing MDMA, which the organization intended to re-distribute via the darknet.

      **B.**    **February 11, 2020, Drug Seizures**

      6.    In connection with this investigation, on February 10, 2020, the Honorable Jacqueline Chooljian, United States Magistrate Judge, authorized search warrants for two locations in the Central District of California associated with the organization, including the residence of Rane Melkom and Teresa McGrath (the "Scoville Residence").[1]  Law enforcement officers executed the warrants on February 11, 2020.  Melkom and McGrath were present during the search of the Scoville Residence.

      7.    In a shed adjoining the Scoville residence, law enforcement officers found the following:

          a.    22.183 kilograms of actual methamphetamine;

          b.    Approximately 6,701 grams of MDMA;

          c.    Two loaded Glock pistols; and

          d.    60 packaged and sealed USPS priority mail envelopes addressed to various addresses, in over 35 states

---

[1] Melkom and McGrath have pleaded guilty to violations of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii) (Conspiracy to Distribute Methamphetamine) and 18 U.S.C. §§ 1956(h) (Money Laundering Conspiracy) and 924(c) (Possession of Firearms in Furtherance of Drug Trafficking) related to the conduct described herein.  See United States v. Melkom and McGrath, No. CR 20-136-AB.

across the country, that were later discovered to contain methamphetamine and MDMA.

8.  Based on my training, experience, and investigation in this case, I recognized the shed to be a workshop where methamphetamine and MDMA were prepared and packaged for distribution to customers who purchased those drugs on the darknet.

9.  In addition, in the residence portion of the Scoville Residence, law enforcement officers seized a loaded FNH pistol from under Melkom and McGrath's bed.

**C.  Surveillance Video Captured SANGBARANI's Involvement in February 2020**

10. During the search of the Scoville Residence, agents discovered two surveillance cameras: one placed above the entrance to the shed where the drugs were found, facing the driveway, and the second attached to a fence, also facing the driveway.

11. On August 5, 2020, the Honorable Pedro V. Castillo, United States Magistrate Judge, Central District of California, authorized a warrant for the production and search of information -- including video recordings -- associated with the surveillance cameras held with the provider of those cameras.

12. During my review of video recordings obtained pursuant to the warrant, I observed the following:

    a.  On February 2, 2020, Melkom and SANGBARANI walked out of the residence towards the shed where the drugs were

4

discovered. Melkom unlocked the shed and went inside. SANGBARANI followed and closed the door behind them.

     b. On February 3, 2020, Mark Chavez arrived in a black truck and parked in the driveway.[2] Sometime thereafter, Melkom, Chavez, and SANGBARANI walked into the shed together. SANGBARANI closed the door behind them. After they went inside, McGrath exited the shed wearing latex gloves. Later, Melkom opened the shed door and set USPS bins containing USPS parcels on the ground. Melkom was wearing latex gloves. Chavez and Melkom then took bins full of parcels to Chavez's truck. SANGBARANI remained in the shed and closed the door.

     c. On February 5, 2020, SANGBARANI walked out of the residence towards the shed. SANGBARANI unlocked the shed, went inside, and closed the door. A few seconds later, Melkom walked out of the residence and into the shed. Later that day, SANGBARANI walked out of the shed, placed a large black trash bag in front of the door, and walked into the residence. Shortly thereafter, Melkom walked out of the residence and into the shed, moving the trash bag out of the way. A few seconds later, Melkom walked out wearing latex gloves and carrying a large brown box that he placed into a car (registered to his father) on the driveway. Melkom was not wearing the gloves when he entered the shed.

---

[2] Chavez has pleaded guilty to violations of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii) (Conspiracy to Distribute Methamphetamine) and 18 U.S.C. § 924(c) (Possession of Firearms in Furtherance of Drug Trafficking) related to the conduct described herein. See United States v. Chavez, No. CR 20-130-AB.

5

13. Based on my training, experience, and investigation in this case, I believe that when SANGBARANI was inside of the shed, he was assisting Melkom and McGrath with the packaging of drugs for distribution to customers who purchased those drugs via the dark web.

### D. CC-1 Found with Drug Proceeds

14. Based, in part, on their review of digital evidence seized during the search of the Scoville residence, agents later identified Co-Conspirator 1 ("CC-1") as the individual responsible for receiving virtual currency proceeds in exchange for the drugs sold via the darknet. As discussed further below, financial records indicated that CC-1 would send portions of the proceeds received in exchange for the drugs sold via the darknet to co-conspirators, including SANGBARANI and McGrath, to purchase additional drugs and for the co-conspirators' personal use.

15. Agents searched CC-1's home in the Northern District of California on May 19, 2020, pursuant to a federal search warrant. During the search, agents discovered a USB flash drive plugged in to the back of CC-1's TV. A subsequent search of that flash drive revealed virtual currency wallet information where proceeds from the organization's sale of drugs on the darknet were stored. One of the wallets was associated with CC-1's Rahakott account and contained approximately $1.45 million

in various virtual currencies (based on the value at the time of the search).[3]

### E. CC-1 Sent Dark Web Drug Proceeds to SANGBARANI's Coinbase Account

16. A Homeland Security Investigations (HSI) Special Agent participating in this investigation reviewed Coinbase account records and informed me of the following:

   a. SANGBARANI opened a Coinbase account on December 12, 2017. As part of the account opening process, SANGBARANI uploaded images of his California driver's license. SANGBARANI also linked the account to Bank of America and Wells Fargo checking accounts held in his name.

   b. Records for SANGBARANI's Coinbase account show minimal activity prior to January 2019. Between January 3, 2019, and August 5, 2019, however, SANGBARANI's account received a total of 31.67486381 bitcoin -- valued at the time at approximately $140,098.08 -- over 24 transactions. Shortly after almost every transaction, SANGBARANI exchanged the bitcoin for U.S. dollars and transferred the money out of the account.

17. The Coinbase records included transaction hashes for the 24 transactions.[4] Agents input the transaction hashes into Chainalysis (a blockchain analytics tool) along with information from CC-1's Rahakott account. Chainalysis indicated the

---

[3] Rahakott is an online virtual currency wallet and mixing service. Rahakott accounts function as bank accounts for virtual currencies.

[4] A transaction hash is a unique string of characters given to every blockchain transaction that is verified and added to the blockchain.

majority of the Coinbase transactions were indirectly exposed to various cryptocurrency exchanges[5] but the following transactions were traced to CC-1's Rahakott account:

    a.  On April 16, 2019, SANGBARANI's Coinbase account received 1.9322508 bitcoin, valued at the time at approximately $10,028.43.  Chainalysis traced the source funding to Rahakott wallets controlled by CC-1.  The same day, SANGBARANI sold 1.9318943 bitcoin for $9,851.97 and withdrew $9,850.  Bank of America records show that SANGBARANI's account received $9,850 from Coinbase on April 17, 2019.

    b.  On May 4, 2019, SANGBARANI's Coinbase account received 1.64953402 bitcoin, valued at the time at approximately $9,471.73.  Chainalysis traced the source funding to a Rahakott wallet controlled by CC-1.  The next day, SANGBARANI sold 1.64995192 bitcoin for $9,229.53.  The full account balance of $9,231.50 was withdrawn on May 6, 2019.  Bank of America records show that SANGBARANI's account received $9,231.50 from Coinbase on May 7, 2019.

18. Based on my background, training, experience, and investigation in this case, I believe that CC-1 sent a portion of the organization's dark web drug proceeds, in the form of virtual currency, to SANGBARANI's Coinbase account and that

---

[5] When a user deposits virtual currencies in an exchange or a similar service, the service itself often moves the funds between its internal wallets, preventing blockchain analysis from directly tracing funds from sending to receiving accounts. When the funds pass through (or hop) at least one intermediary non-service address, Chainalysis considers any related transaction hashes to be indirectly exposed.

SANGBARANI converted the proceeds to fiat currency that he then transferred to his checking accounts.

## IV. CONCLUSION

19. For all the reasons described above, there is probable cause to believe that SANGBARANI has committed a violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(A)(viii), Conspiracy to Distribute Methamphetamine (50 Grams or More).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st  day of
July , 2022.

_____
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

9